# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
## SOUTHERN DIVISION

D'LESIA CHAMBERS,                    )
                                     )
            Plaintiff,               )
                                     )
v.                                   )        Case No. 6:15-3074-CV-S-MDH
                                     )
DYLAN CORPORATE SERVICES,            )
INC. and ROBERT J. ECKHOLT,          )
                                     )
            Defendants.              )
                                     )
                                     )
                                     )
                                     )
                                     )

## SECOND AMENDED COMPLAINT

**COMES NOW**, Plaintiff, by and through her counsel of record, and for her Second Amended Complaint against Defendants alleges as follows:

### Parties and Factual Background

1.      D'Lesia Chambers ("Lesia"), a single individual, resides in Polk County, Missouri.

2.      Dylan may be served through its President, Robert J. Eckholt, at its offices at 4000 West 114th Street, Suite 140, Leawood, KS 66211.

3.      Robert J. Eckholt is an individual who may be served at his place of business at 4000 West 114th Street, Suite 140, Leawood, KS 66211 or at his residential address at 11609 Pawnee Lane, Leawood, KS 66211 ("Eckholt").

4.      Lesia graduated from Rich Hill High School, Rich Hill, Missouri.

1

5. Lesia attended Southwest Missouri State University in 1974.

6. Lesia has been a fulltime homemaker and mother since 1979 and grandmother since 2010.

7. Prior to her husband's death in May, 2009, Ms. Chambers worked various jobs until she opened "West Side For Her" in downtown Bolivar in approximately 1990 (women's clothing store). She never went back to the store after her husband passed away and it closed in September, 2009.

8. Lesia has never had any formal financial or investment education or experience.

9. Dylan Corporate Services, Inc. is a Kansas Corporation with offices in Arizona and Kansas doing business for clients in Missouri, Kansas, Arizona and other states ("Dylan"), founded and owned by Mr. Eckholt.

10. Eckholt, as the owner, director and president of Dylan, at all times referenced herein, was acting as the agent and/or the authorized representative of Dylan.

11. Defendants serviced clients in Missouri, including Lesia.

12. Defendant Eckholt, at all relevant times, was a member of the Missouri Society of Certified Public Accountants as are all of the CPA's employed by Dylan.

13. Many of the misrepresentations and other communications occurred while Lesia was in Missouri.

14. Defendants billed Lesia for all of their services by delivering their billings to Lesia in Missouri, and Lesia paid from Missouri.

15. Prior to the death of Lesia's husband in May, 2009, Lesia never handled any of the business affairs relating to finance, investment or planning for retirement.

2

16.     Lesia was referred to Defendants by Kent Witrock at Bryan, Cave, the estate planning attorney handling her late husband's estate.

17.     The referral to a CPA who touted his valuation of business expertise was appropriate due to the various businesses of the decedent that needed to be valued for estate tax purposes and possible transfer.

18.     Lesia turned all of the financial, accounting and tax records over to Defendants and began communicating with them for purposes of preparation of the estate tax return, valuations, payroll, investments and financial statements.

19.     Eckholt and Dylan became more familiar with her assets, liabilities, income and expenses and lack of financial sophistication than anyone.

20.     Within twelve (12) months of representing her, he had billed her tens of thousands of dollars for valuation, investments, financial statement preparation, tax and consulting services.

21.     Lesia, knowing that she had bills to pay, a home mortgage; potential business-related debts, and other living expenses, understandably sought from those trusted advisors a recommendation: Seeking guidance as to where, and with who, and how much she should invest to put her investable assets to work producing income and growth.

22.     She also sought the advice of Kent Whitrock as to who to use.

23.     Mr. Whitrock recommended a local Kansas City financial advisor. Mr. Eckholt recommended Anthony "Tony" Stacy, an Arizona financial advisor investing clients in funds known as the Palo Verde Fund, L.P. and the Palo Verde Private Equity Fund, L.P.

3

24.     At all times relevant hereto, Dylan and Eckholt acted as a tax, accounting and financial advisors to Lesia.

25.     Following the death of her husband, she leaned heavily on the advice of her trusted advisors.  Defendants were her only trusted financial advisors from Mr. Chambers' death in May, 2009, through 2014, in addition to Mr. Stacy.

26.     On March, 2010, Lesia met with Defendants on several occasions and talked about adjustments to her financial situation.

27.     By March of 2010, Defendants were well aware of Lesia's overexposure to risky ventures due to her husband's business activities.

28.     On March 29, 2010, Eckholt emailed Lesia asking if she was available to interview potential investment advisors on April 15, 2010.

29.     On April 8, 2010, Eckholt confirms that he has set up a meeting between Lesia and Tony Stacy on April 12, 2010.

30.     Stacy flew from Arizona to Kansas City for this meeting.

31.     At the meeting at Eckholt's office, Eckholt told Stacy and Lesia that Lesia had $2,500,000.00 to invest.

32.     In    subsequent    communications,    Defendant    Eckholt    strongly recommended, solicited and encouraged Lesia to invest with Stacy and his funds and/or utilize Stacy as a financial advisor to work with her and Dylan regarding her investments.

33.     Near the end of April, email exchanges between Lesia and Eckholt show that she was clearly impressed with Stacy, but also shows how conservative she is – wanting to pay off loans and concerned that Stacy's minimum of $750,000.00 is too

4

much. Eckholt responds that her seeking advice on all of this deserves more than an email from him and he wants to discuss it face to face or over the phone.

34.     He then, again, in future communications, convinces her that she should not pay off the note and should, instead, invest the minimum allowed of $750,000.00 with Stacy.

35.     On May 4, 2010, Lesia receives a billing from Defendants for over $3,000.00 for the month of April, which includes billing for "investment meeting".

36.     On May 6, 2010, when Lesia asks Eckholt's thoughts again on Stacy, Eckholt responded "Tony was 100% in cash for the better part of the day and managed to gain .27% for the PV Fund today. You should call and ask the other guy how he did. . ."

37.     Eckholt failed to tell Chambers that judging a financial advisor by the performance of the advisor and his clients on *one* (1) day in the market was not only unwise, but that it should not even be, taken alone, relevant at all.

38.     On May 7, 2010, Lesia advises that she took his advice and contacted "the other guy" and that it was not good for any of his clients (the prior day). So Lesia then asked Eckholt how "we move forward" with Stacy to which Eckholt responds that Eckholt will speak with Stacy over the weekend and let her know the next week.

39.     On May 12, 2010, Lesia, again, emails Eckholt "Do you still feel Tony is the way to go . . ." and Eckholt responds "Yes, I do, Lesia . . .".

40.     Providing financial advice and investment recommendations to Lesia and referring her to and/or recommending Stacy and the Palo Verde Funds, all of which Eckholt did, was within the course and scope of Eckholt's agency relationship with Dylan.

5

41.     Defendant Dylan advertises on the internet as assisting with financial planning: "We can guide you through tough decision making processes such as asset allocation, investment performance monitoring, . . . whether you are developing an investment strategy or evaluating current investments . . . we can help you to take the proper steps to reach your goals . . ." as well as estate and trust planning.

42.     That website, told its clients in 2013 that Dylan Corporate Services, Inc. provided "financial guides" and "financial tools" and that "*for years* Dylan . . . has been providing quality, personalized financial guidance to individuals . . . our mission is to help clients maintain financial viability [and] achieve future goals . . ." (emphasis added) and then impresses with Eckholt's international business and taxation studies at Oxford and forty (40) years of accounting and business experience . . . "our professional services include: advisory services; financial and retirement planning; . . . goal is to help you reach your financial goals and maintain financial independence through a comfortable retirement. . ."

43.     Defendant Eckholt introduced, solicited and recommended Stacy and the investments in the Stacy controlled Palo Verde Funds.

44.     Lesia also told Eckholt that she did not want to risk losing her monies at which time Eckholt assured her that the investment in the Funds were safe with a minimum of seventy-five (75%) percent in high quality stocks and bonds.

45.     Lesia's investment objectives were primarily to produce income and secondarily to grow her assets, all for purposes of sustaining her during the remainder of her life in that she had no pension or profit sharing plan benefits as part of her portfolio.

6

46. Via a telephone call between Eckholt and Lesia on or about May 3, 2010, Eckholt assured her that the returns would outpace traditional investments in fixed income and equity markets, which were publicly traded at the same or less risk than a typical retirement portfolio; that they would be safe, long term investments.

47. Defendants failed to disclose that Stacy, unbeknownced to Plaintiff, had four (4) prior customer complaints, all arising from Stacy's alleged negligence, negligent or intentional misrepresentations.

48. While Eckholt represented Stacy to be a very special, successful financial advisor, Stacy's BrokerCheck Report, available to anyone, reflected these four (4) customer complaints and the rest of his educational and work experience history reflecting nothing extraordinary with no stated history of successful selection, valuation or operation, of private businesses.

49. Despite that, Eckholt wholeheartedly recommended Stacy and the Funds operated and controlled by Stacy without disclosing that Eckholt's motivation was to impress and gain influence with Stacy in the hopes of developing Stacy and the Palo Verde Funds as clients and/or referral sources and convincing Stacy and the Palo Verde Funds to help finance and/or invest in Eruces.

50. On multiple occasions, occurring at his office and over the telephone, in late 2009 and early 2010, Eckholt represented that Stacy was consistently achieving investment returns of 15% to 18% despite the biggest bear market since the depression.

51. The misrepresentations regarding Stacy's ability as a financial advisor and his historical returns percentage occurred in late 2009 and early 2010, both over the telephone and at an in person meeting with Eckholt in his office.

7

52.     In reliance upon Eckholt's advice and representations and unaware of the materials facts that Defendants concealed, Lesia invested $750,000.00 in The Palo Verde Fund, L.P. on May 20, 2010 through Stacy.

53.     At the same time, on May 19 or 20, 2010, Lesia forwarded, at Defendant's recommendation, three (3) checks totaling One Million Dollars ($1,000,000.00).

54.     The Schwab account application showed the investment advisor to be Paragon Capital Advisors, LLC,("Paragon") a Tony Stacy company, set up as a margin account so that stocks could be purchased using other stocks in the account as collateral (gives the advisor the ability to leverage the account which, of course, increases risk).

55.     The account documentation, executed on or about May 20, 2010, allowed Paragon as a registered investment advisory firm, to be the attorney-in-fact with the discretionary authority to buy, sell and effect transactions in the account.

56.     The subscription booklet for Palo Verde Fund, LP also shows Paragon as the general partner.

57.     From this date through the closing of the Schwab account, the funds in the Schwab account were never invested pursuant to any well-managed account strategy but, rather held in cash and no more than Three Hundred Sixty Thousand Dollars ($360,000.00) in certificates of deposit.

58.     The Schwab account did little to generate income for Plaintiff averaging between 1% and 1.5% return gross of Paragon's fees.

59.     Prior to the second investment in the Palo Verde Funds through Stacy, Eckholt was still well aware of Lesia's financial condition.

8

60.     In December or 2010, Stacy recommends moving another $250,000.00 from the Schwab account to the Palo Verde Funds bringing her total investment in the Palo Verde Funds to $1,000,000.00. Stacy acknowledges that Eckholt's recommendation is important to Lesia "Will discuss with Bob and get his recommendation as well."

61.     By email of December 27, 2010, Stacy indicates that he sent Bob Eckholt an email and Eckholt "agrees with my recommendation that we need to expose another $250,000.00 from your Schwab account . . . [to the Palo Verde Funds]".

62.     On January 17, 2011, Lesia invested an additional $250,000.00 in The Palo Verde Fund, L.P.

63.     But for Defendants' misrepresentations and material omissions, Lesia would not have invested through Stacy or in these funds.

64.     Unbeknownced to Lesia, and not disclosed by Eckholt, several other investors and their advisors became concerned about the Palo Verde Funds and began demanding a return of their monies. Several investors received some or all their monies back as a result.

65.     Upon information and belief, Plaintiff alleges that Eckholt knew or should have known that Stacy and the Funds were not suitable; that Stacy's operation of the Funds, from very early on, was not professional; that the Funds were not performing; that Stacy was not returning fifteen (15%) to eighteen (18%) percent to the investors; that Stacy lacked the expertise and the Palo Verde Funds lacked the expertise to select, value, operate and administer investor funds and assets with ordinary care; and were not operating the Funds in the best interest of the investors.

9

66.     Stacy's lack of transparency in the operation of the Funds, in the face of numerous investors seeking accurate reporting, and the illiquidity of the Funds while investors were seeking to withdraw their funds, led to several other investors seeking and successfully obtaining, through Court Order, a Receiver for the Funds.

67.     The Receiver's investigation and operation of the Funds, including the deposition of Stacy, show a disorganized operation and fraudulent transfers of substantial funds for the personal benefit of Stacy and to the detriment of the investors, including Lesia.

68.     The Receiver's investigation also shows Eckholt's involvement in steering Stacy to one or more investments for the benefit of Eckholt.

69.     On or about December 2, 2013, at a meeting between Lesia and Eckholt, at Eckholt's office, Eckholt denied receiving anything of value in exchange for recommending these investments to her or successfully convincing her to invest.

70.     Contrary to Eckholt's representations to Lesia on April 12, 2010 and December 2, 2013, that he was not receiving anything of value in exchange for the referral to Stacy, the Receiver's investigation so far shows substantial funds of over $132,000.00 being paid to Defendants and affiliated entities from the Funds for undisclosed "consulting" services, violations, investment-related expenses and jet services." See **Exhibit "A"** and **"B"** attached hereto and incorporated herein by reference.

71.     Lesia anticipates losing most, if not all, of her $1,000,000.00 investment in the Funds, as well as the growth and income that she would have received had she

invested those funds in a well-managed account portfolio, based upon the Receiver's investigation and activity to date.

72.     Defendants engaged in the business of advising others, including Lesia, as to the advisability of investing in securities, the Funds, and made recommendations or otherwise gave investment advice regarding the Funds.

### Additional Misrepresentations and Omissions

73.     Neither Eckholt, or Dylan through any of its other representatives, disclosed that Eckholt was Vice President of Eruces, Inc. ("Eruces") and that at the time of the second investment, Eruces and Eckholt were being threatened with a class action lawsuit by John F. Edgar, who was also ultimately the Plaintiff in a class action against Eckholt and Eruces.

74.     Eckholt did not disclose that at the time he made the recommendations, he was, or was seeking to be, based upon information and belief, the CPA and/or investment analyst for Stacy and/or related entities including, without limitation, the Funds in which Lesia was investing and failed to disclose that Defendants Dylan and Eckholt were benefitting and/or would be benefitting or seeking to benefit from such relationship.

75.     Eckholt further failed to disclose that his referral of Chambers had almost immediately resulted in business for Defendants and affiliates from Palo Verde Fund, L.P. and that Defendants and/or affiliates began doing work for that Fund almost immediately and Dylan received wire transfer payments on October 26, 2010, November 16, 2010, March 16, 2011 in the amounts of over $10,000.00, almost $21,000.00 and over $11,000.00, respectively.  Thereafter, Dylan received several other payments which, by April of 2013, totaled $132,927.68.

11

76. Eckholt and Dylan failed to disclose to Lesia that at the time of her second investment of $250,000.00 that Eckholt and Stacy, as lenders, had loaned $250,000.00 to Eruces; that such loan was in default; and that Eckholt had recommended that Stacy utilize Verde Capital Funds totaling $425,000.00 to purchase 685,000 shares of Eruces, all to the detriment of Lesia and the Funds and for the benefit of Eckholt.

77. Upon information and belief, at Eckholt's urging, Stacy withdrew $425,000.00 from the Palo Verde Funds so he could purchase Eruces stock through DC Capital Partners, LLC, all showing as a loan on the Palo Verde book to the Palo Verde books to the Palo Verde general partner, Stacy. See **Exhibit "B"** attached hereto.

78. Eckholt also failed to disclose a repayment of a $50,000.00 loan to American Energy Solutions, a Palo Verde Funds investment.

79. Upon information and belief, the loan was repaid to Eckholt, and preferred over other creditors of American Energy, as a result of his success in convincing Chambers to invest.

80. Eckholt and Dylan failed to disclose to Lesia that it is a violation of ethical and other professional standards, including fiduciary standards for certified public accountants and/or investment and/or financial advisors, to take the actions described above, including recommending investments to their clients, especially investments in entities from which the Defendants benefit or from which the Defendants seek to benefit, thus not putting Lesia's interests first.

81. Eckholt failed to disclose, and later even falsely denied at the December 2, 2013 meeting at Eckholt's office attended by Lesia and Eckholt, that Eckholt was receiving any compensation from the Funds or Stacy.

12

82.     Eckholt failed to disclose that Eckholt over-billed Lesia for services rendered which, upon information and belief, Plaintiff alleges Defendants did.

83.     After the fact, Eckholt has repeatedly reassured Lesia that he thought she would get all of her money back and even make money on these investments in the Funds; that she need not hire an attorney but that she should, rather, simply prepare a letter that Eckholt speaks for her, let him have the communications with the Receiver and Stacy and tell her what he finds out.   In short, recommending that Lesia again trust Defendants to act for her.

84.     Eckholt encouraged Lesia to stay the course as recently as the Summer of 2014, representing to her that he predicted the Receiver would be very successful while complimenting the Receiver, but not realizing that Lesia was receiving updates showing Eckholt simultaneously leading the charge and criticizing the Receiver, objecting to the Receiver receiving compensation and the Receiver's attorneys receiving compensation and taking significant actions in the Receivership in an attempt to convince the Receiver to resign.

85.     Defendants failed to disclose that Eckholt was recommending to Stacy that the Fund invest in entities for the benefit of Defendants, i.e. Eruces.

86.     Eckholt knew and did not disclose to Plaintiff that the investments through Stacy that Defendants were recommending to Lesia were unsuitable.

87.     Eckholt did not disclose that they were making such recommendations because they were in the best interest of Defendants, not Lesia's best interests.

88.     Eckholt failed to disclose that Eckholt had a history of making misrepresentations to potential investors in other ventures in which Eckholt had an interest; namely, Eruces, ultimately leading to litigation against Eckholt.

89.     Eckholt failed to disclose to Lesia that the investments in the Funds, for her portfolio, considering her other assets, would result in the unsuitable overconcentration of her assets in speculative, high risk investments which were unsuitable for her.

90.     All of the above misrepresentations and omissions occurred prior to Plaintiff's investment in the Funds and/or at a time when a demand by Eckholt to return her funds would have probably resulting in a return of all or most of her funds.

91.     Eckholt ignored Lesia's investment objectives and risk tolerance, selecting for her and recommending to her the Funds managed and controlled by Stacy.

92.     Lesia has never subscribed to nor read any financial publications for the purpose of making investment decisions or assisting in the investment decision process and had no other source for her financial advice throughout the relevant time period from anyone other than Defendants and later Stacy.

93.     Having no substantial financial investment or financial planning experience, Lesia relied upon and trusted the advice of Defendants as experts in the field, as Eckholt held himself and Dylan out to be, through communications with Lesia.

94.     Eckholt knew or should have known of Lesia's lack of financial sophistication, especially with regard to investments in small privately held entities through the use of an investment manager such as Stacy, and knew or should have known of her total reliance upon the advice or Eckholt to turn to Stacy and the Palo Verde Funds.

14

95.     All of Eckholt's wrongful acts set forth herein result in liability, not only to Eckholt but also to Dylan, his employer, pursuant to the Doctrine of Respondeat Superior as he perpetrated all violations within the course and scope of his employment or agency during the time periods referenced herein. Thus, defenses of good faith and due diligence are not available to Dylan for Plaintiff's claims based on Eckholt's actions, statements and omissions.

## Damages

96.     As a result of Defendant Eckholt's recommendations, Lesia invested One Million Dollars ($1,000,000.00) in the Funds and despite demand, the Funds and Receiver in charge of those Funds and Mr. Stacy have failed and refused to return the funds.

97.     But for the professionally negligent, unethical, fraudulent and/or unsuitable recommendations of Eckholt, had Plaintiff invested the funds in a well-managed account portfolio from the date of her investment in the Funds, her investment portfolio would have grown substantially in an amount to be determined by the trier of fact in this matter, but believed to be more than 100%.

98.     Eckholt also advised her to keep up to One Million Dollars ($1,000,000.00) in a Schwab account because he thought she needed that much liquidity. Based upon information and belief, Eckholt had her hold these funds on the side with the intention of using it as a carrot to obtain work from Mr. Stacy and the Palo Verde entities.

99.     There was no other reason for Eckholt to recommend she do so. He was simultaneously telling her not to pay down debt.

100.     Plaintiff did have liquidity needs believed to be One Hundred Fifty and Two Hundred Fifty Thousand Dollars ($150,000.00 - $250,000.00) on one or more occasions which could have been part of a well-managed portfolio strategy but was not.

101.     His financial advice to leave these funds in cash plus $360,000.00 in CDs was not suitable for Lesia anymore than the incredibly risky private ventures or day-trading 100% in equities through the Palo Verde Fund.

102.     But for this these funds "sitting" in the Schwab account for years, Lesia would have been in a well-managed account portfolio with these funds as well.

103.     Eckholt recommended that Lesia transfer Two Hundred Fifty Thousand Dollars ($250,000.00) from this Schwab account to the Palo Verde Fund in January of 2011.

104.     As a result, she has been damaged by the failure of these funds to appreciate as they would in a well-managed account portfolio.

105.     Such damages were directly caused, or directly contributed to cause, the damage suffered by Lesia.

### COUNT I

### PROFESSIONAL NEGLIGENCE

106.     The above factual allegations are incorporated herein as if fully set forth at length.

107.     Eckholt, and his employer, Dylan, owed a duty to Plaintiff to exercise that degree of skill and learning ordinarily used under the same or similar circumstances by the members of the Defendants' profession.

108. Alternatively, Defendants owed a duty to Plaintiff to exercise that degree of care which is standard in the securities industry for financial consultants and advisors toward their customers.

109. Defendants failed to exercise the degree of care which is standard in one or both of these industries as is more specifically shown by their actions and omissions as set forth in the factual allegations set forth above and in the other Counts. In addition to the above factual allegations, these failures also include the following:

    a. Negligently failing to abide by accounting industry standards; namely:

        i. Recommending investment managers/advisors;

        ii. Recommending investment managers/advisors without performing sufficient due diligence;

        iii. Recommending investment managers/advisors without disclosing all material facts;

        iiii. Recommending investment managers/advisors without disclosing Defendants' conflicts of interest;

    b. Failing to disclose that Stacy's Palo Verde Funds were not suitable for Plaintiff;

    c. Misrepresenting Stacy as an extraordinarily successful financial advisor and manager;

    d. Failing to disclose the degree of risk involved;

    e. Failing to disclose Eckholt's personal financial motivations in making the recommendation to Stacy and the Funds; and

    f. Making the other misrepresentations and failing to disclose the other materials facts described above and below.

110. By engaging in the conduct described above, Defendants were negligent and/or acted with conscious indifference and/or reckless disregard for the rights of

17

Plaintiff, Lesia Chambers directly causing or directly contributing to cause her the damages alleged above.

WHEREFORE, Plaintiff prays for actual out-of-pocket damages of One Million Dollars ($1,000,000.00), plus interest at the rate of nine (9%) percent per annum since the dates of the investments, plus the lost increase in Plaintiff, Lesia Chambers' net worth but for the malfeasance of Defendants, had Lesia's One Million Seven Hundred Fifty Thousand Dollars ($1,750,000.00) investment, at its peak, been properly managed from the date of investment through the trial of this matter, plus post-judgment interest at the rate of nine (9%) percent per annum until paid and all costs of Court and for such other and further relief as the Court deems just and proper under the circumstances.

## COUNT II
## BREACH OF FIDUCIARY DUTY

111. The above factual allegations are incorporated herein by reference as if fully set forth at length.

112. Eckholt, and his employer, Dylan, held themselves out as having expertise in investment decisions, financial advice, consulting and planning.

113. Plaintiff placed her trust and confidence in Defendants, had faith in the financial judgment of Defendants and faith in Defendants' integrity to deal in Plaintiff's funds with Plaintiff's best interests in mind, and with the highest degree of care and within the applicable laws and regulations.

114. Such a relationship was sought by Defendants through Eckholt's communications with Plaintiff.

18

115. Plaintiff was unable to evaluate Defendants' recommendations and to exercise any independent judgment with respect to the transactions or status of her accounts during the life of the accounts because:

    a. Defendants failed to inform Plaintiff of the risk associated with the Funds recommended by Eckholt and of the material facts described above; and

    b. Plaintiff's lack of business and financial sophistication which was known or should have been known to Defendants.

116. The relationship of Defendants with Lesia was a fiduciary relationship.

117. Thus, Eckholt and Dylan owed fiduciary duties to the Plaintiff.

118. Defendants breached their fiduciary duties to the Plaintiff by recommending unsuitable and unreasonable investments to Plaintiff in light of Plaintiff's investment objectives and risk tolerance; by failing to provide the degree of care which is standard in the industry; namely, not to recommend investments to clients or, alternatively, not to recommend investments to clients which benefit the CPA; or, alternatively, not to recommend investments to clients which benefit the CPA without disclosing all material facts including conflicts of interest; and by making the misrepresentations and omissions set forth above, all of which are incorporated herein by reference; by unsuitably recommending the Funds; by negligently recommending the Funds; and by failing to recommend a proper asset allocation and/or a well-balanced diversified portfolio in line with industry standards based upon Plaintiff's investment objectives and risk tolerance.

119. As a direct result of the above, Plaintiff was damaged as set forth above.

19

**WHEREFORE**, Plaintiff prays for actual out-of-pocket damages of One Million Dollars ($1,000,000.00), plus interest at the rate of nine (9%) percent per annum, plus the lost increase in Plaintiff, Lesia Chambers' net worth but for the malfeasance of Defendants, had Lesia's One Million Seven Hundred Fifty Thousand Dollars ($1,750,000.00) investment been properly managed, plus punitive damages as more specifically pled below, plus post-judgment interest at the rate of nine (9%) percent per annum until paid and all costs of Court and for such other and further relief as the Court deems just and proper under the circumstances.

## COUNT III

## VIOLATION OF THE MISSOURI SECURITIES ACT RSMo. §409.5-501 AND/OR 5-502

120.     The above factual allegations are incorporated herein by reference as if fully set forth at length.

121.     Chambers' investment through Eckholt, Stacy and the Palo Verde Funds constituted the sale of a security. See RSMo. §409.1-102(26) and (28).

122.     The conduct of Eckholt as set forth herein, constitutes the offering or selling of a security or securities by means of untrue statements of material fact(s) or omissions to state a material fact(s) necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading.

123.     Alternatively, Eckholt's behavior, statements and omissions constitute the employment of scheme, device or artifice to defraud also in violation of RSMo. §409.5-501 and/or 502.

124. Alternatively, Defendant Eckholt's conduct also constitutes his engagement in an act, practice or course of business that operates or would operate as a fraud or deceit upon another person; namely, Chambers, also in violation of the Act.

125. These violations expose Defendants Eckholt and Dylan to the civil liability of the Act including the recovery of the consideration paid for the security, less the amount of any income received on the security (the Palo Verde Funds invested in by Chambers), interest at the rate of eight (8%) percent per annum from the date of the purchase, costs and reasonable attorneys' fees as determined by the Court or for actual damages.

126. See RSMo. §409.5-509(f) in that Defendant Eckholt received indirect consideration for providing investment advice to Chambers that employed a device, scheme, or artifice to defraud Chambers or engaged in an act, practice or course of business that operated or would operate as a fraud or deceit on Chambers.

127. Individually and as an agent and employee of Dylan, Defendant Eckholt acted in concert with Stacy and the Palo Verde Funds to offer or sell an interest in Palo Verde Private Equity Fund, L.P. and/or Palo Verde Fund, L.P. to Lesia.

128. Lesia did not know of the untruths or omissions.

129. Defendants knew or in the exercise of reasonable care could have known of the untruths and omissions.

130. As a result of the above, Lesia was damaged.

131. Eckholt is thus liable to Chambers for her actual damages caused by the fraudulent conduct, interest at the rate of eight (8%) percent per year from the date of the

fraudulent conduct, costs, and reasonable attorneys' fees as determined by the Court, less the amount of any income (zero) received as a result of the fraudulent conduct.

**WHEREFORE**, Plaintiff prays for actual out-of-pocket damages of One Million Dollars ($1,000,000.00), plus interest at the rate of eight (8%) percent per annum, plus the lost increase in Lesia Chambers' net worth, but for the malfeasance of Defendants, had Lesia's One Million Seven Hundred Fifty Thousand Dollars ($1,750,000.00) investment been properly managed, plus punitive damages as more specifically pled below, plus post-judgment interest at the rate of eight (8%) percent per annum and all costs of Court, plus reasonable attorneys' fees and expenses as mandated by the Missouri Securities Act, and for such other and further relief as the Court deems just and proper under the circumstances.

## COUNT IV

## FRAUD

132.    The above factual allegations are incorporated herein by reference as if fully set forth at length.

133.    Dylan, through Eckholt, made misrepresentations and failed to disclose the material facts set forth above.

134.    The representations and/or omissions of Defendants as more particularly set forth above constitute common law fraud as the representations are false and material.

135.    Defendants knew of the falsity of the representations or were ignorant of the truth or falsity.

22

136.     Defendants intended that such representations should be acted upon by Plaintiff in a manner reasonably contemplated; namely, investing with Stacy into the Funds.

137.     Defendants failed to disclose material facts.

138.     Plaintiff, Lesia Chambers, did not know of the falsity of the representations or know of the material facts not disclosed and relied upon the truth of the statements and the duty of Defendants to analyze and accurately communicate the material facts.

139.     Plaintiff Lesia Chambers had a right to rely on same, did rely on same, and as a direct result of such misrepresentations and/or omissions, has thus suffered the injuries alleged.

**WHEREFORE**, Plaintiff prays for actual out-of-pocket damages of One Million Dollars ($1,000,000.00) as a result of the recommendations of Defendants, plus interest at the rate of nine (9%) percent per annum, plus the lost increase in Lesia Chambers' net worth, but for the malfeasance of Defendants, had Lesia's One Million Seven Hundred Fifty Thousand Dollars ($1,750,000.00) investment been properly managed, plus punitive damages as more specifically pled below, plus post-judgment interest at the rate of nine (9%) percent per annum until paid and all costs of Court and for such other and further relief as the Court deems just and proper under the circumstances.

## COUNT V

## PUNITIVE DAMAGES

140.     The above factual allegations are incorporated herein by reference.

141. Defendants' actions including, but not limited to, the shocking, outrageous actions of Defendants including the intentional or reckless misrepresentations and/or omissions as more particularly set forth in the Counts above entitle the Plaintiff to punitive damages in an amount sufficient to punish Defendants and deter them and others from similar conduct.

**WHEREFORE**, Plaintiff prays for punitive damages as more specifically pled below, plus post-judgment interest at the rate of nine (9%) percent per annum and all costs of Court and for such other and further relief as the Court deems just and proper under the circumstances.

Respectfully submitted,

CARNAHAN, EVANS, CANTWELL
       & BROWN, P.C.

By _____
    Joseph D. Sheppard, III
    Missouri Bar No. 37525
    A. Jay Preston
    Missouri Bar No. 64096

CARNAHAN, EVANS, CANTWELL
    & BROWN, P.C.
2805 S. Ingram Mill Road
P.O. Box 10009 G.S.S.
Springfield, MO 65808-0009
Phone: (417) 447-4400
Fax: (417) 447-4401
E-Mail: jsheppard@cecb.com
E-Mail: jpreston@cecb.com
Attorneys for Plaintiff

**CERTIFICATE OF SERVICE**

The undersigned certifies that a complete copy of the foregoing document was served upon the attorneys of record for each party to the above action via electronic filing with the U.S. District Court, Southern Division of the Western District of Missouri on the 12th day of November, 2015.

.

/s/ Joseph D. Sheppard, III
Attorney of Record

JDS/rss
15913-001/Doc #568742_3
11/11/2015 8:30 AM